## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DAYNA SAMRA,**            ) | |
|                        ) | |

**DAYNA SAMRA,**                    )

     **Plaintiff,**                    )

     **v.**                    )

**SHAHEEN BUSINESS AND**                    )
**INVESTMENT GROUP, INC.,**                    )     **Civil Action No. 03-2062 (RCL)**
**d/b/a SBIG USA, INC.,**                    )

**and**                    )

**KCALED M. A. CHAHIEN,**                    )
**a/k/a KHALED SHAHEEN,**                    )

     **Defendants.**                    )

## MEMORANDUM OPINION

This matter comes before the Court on the plaintiff's Motion [13] to Enforce Settlement Agreement, filed April 22, 2004.  Upon consideration of the plaintiff's Motion, the opposition thereto, the reply, the applicable law, and the entire record herein, the Court concludes that the plaintiff's Motion will be granted.  In order to best enforce the settlement agreement, the Court will enter an order requiring the defendants to pay $150,000 into the Court's registry.  These funds will be distributed to the plaintiff upon her voluntary dismissal of the underlying case.  The Court's reasoning is set forth below.

### I.  Background

On October 9, 2003, the plaintiff, Dayna Samra ("Samra"), filed a complaint in this Court against the defendants, Khaled Shaheen ("Shaheen") and Shaheen's corporation, Shaheen Business and Investment Group, Inc. ("SBIG").  On the present motion, Samra seeks

enforcement of a settlement agreement in the amount of $150,000 to resolve this dispute.

Samra's civil claims include allegations of sexual harassment and constructive discharge or retaliation by Shaheen and SBIG, as well claims for unpaid wages and out-of-pocket business expenses.[1]  Shaheen is a Jordanian citizen, who resides in Amman, Jordan.  Samra is a Florida resident, who claims that Shaheen hired her to be the vice president of marketing and business development for SBIG.  At the time, Shaheen was in the process of establishing an SBIG office in Washington, D.C. to attract United States government contracts for the reconstruction of Iraq.

Samra met Shaheen at a dinner meeting at the Four Seasons Hotel in Washington, D.C. Samra alleges that Shaheen offered her a job as vice president of public relations and business development of SBIG during the meeting, which she accepted.[2]  According to Samra's complaint, the terms of the employment agreement Shaheen proposed at the meeting were as follows: (1) Samra was required to relocate to Washington, D.C. by June 1, 2003; (2) Samra would be paid an annual salary of $150,000; (3) Samra would receive an annual merit-based bonus; and (4) Samra would have a $15,000 annual stipend for the purchase of business attire. See Compl. at ¶ 11.

Relying on Shaheen's representations as president of SBIG, Samra began working immediately upon her return to Florida, around April 23, 2003, to develop SBIG business for the proposed Washington D.C. office as assigned by SBIG.  In furtherance of SBIG's business, Samra: (1) created a "virtual office" utilizing computers, telephones, fax machines and email to produce work-product for SBIG; (2) traveled back and forth to Washington, D.C. and to Amman,

---

[1] Plaintiff's complaint alleges five counts, which are (1) sexual harassment, constructive discharge and /or retaliation, (2) unpaid wages, (3) unjust enrichment and *quantum meruit*, (4) battery, and (5) assault.  See Pl.'s Compl. at 8–13.

[2] Samra claims that she received a written "Employment Agreement" offer from Shaheen on or about April 29, 2003. Compl. at ¶ 26.

Jordan to attend conferences as a representative of SBIG; (3) participated in business meetings

with Shaheen and SBIG's vice president, Ahed M. Sukhon ("Sukhon"); (4) notified her Florida

landlord that she would vacate her apartment on May 30, 2003; and (5) hired a realtor to find

housing in Washington, D.C..  See, e.g., id. at ¶¶ 15–17, 21, 25, 29, 31.

Meanwhile, Samra contends that Shaheen purposefully evaded dealing with specific

contract changes in her employment agreement;[3] failed to pay her salary or to reimburse her for

business expenses; and made several unwanted sexual advances toward her, causing her to feel

"humiliated, degraded, victimized, embarrassed and emotionally distressed." See Compl. at ¶¶

13–14, 18–20, 23–24.

With respect to the alleged sexual harassment, Samra specifically contends that on or

about April 23 and on May 8, 15, 19, 20 and 23 of 2004, Shaheen: (1) made telephone calls to

Samra suggesting that she share a hotel room with him [Shaheen] at the Four Seasons Hotel in

Washington, D.C.; Compl. at ¶ 18; (2) made "several sexually suggestive and inappropriate

remarks" about her [Samra] in front of Sukhon at a corporate business dinner meeting; id. at ¶

21; and (3) "grabbed her [Samra] and attempted to kiss her" in Shaheen's D.C. hotel room.  Id. at

¶ 23.  All the while, Samra contends that she rebuked Shaheen's advances—both physically and

with verbal protest—as tactfully and as professionally possible.  See id. at ¶¶ 13, 18–19, 23.[4]

Shaheen's answer denies all these allegations.  See Ans. at ¶¶ 39–57.

In June, Samra alleges that Shaheen advised Samra to defer her move to Washington,

D.C. until August 1, 2003.  Compl. at ¶ 30.  Subsequently, on July 7, Sukhon telephoned Samra

---

[3]Samra contends she sent a series of emails to Shaheen with respect to the employment agreement terms, which she received in a written form on April 29, 2003, as well as her relocation issues, but that Shaheen did not respond to her correspondence, nor would Shaheen discuss specifics with Samra when Samra broached topics of her employment agreement in person and over the telephone.  See Compl. at ¶¶ 27–29, 33–36.

[4]Samra's complaint asks for both compensatory and punitive damages, as well as reimbursement for out-of-pocket expenses and back-pay.

to advise her that she should no longer plan to relocate to Washington, D.C. at all.  Id. at ¶ 32.

Samra alleges that the next day, in a telephone conversation with Shaheen, Samra informed

Shaheen that his abrupt change of plans regarding her relocation and his failure to address her

employment agreement concerns were intolerable.  Id. at ¶ 33.

Samra represents that on July 10, she was assigned more work by Shaheen, who until

August 7 insisted Samra was a valued employee of SBIG; Pl.'s Compl. at ¶ 34; but that on

August 8, 2003, Shaheen cut off all communications with Samra.  Id. at ¶ 36.  Samra then

surmised that she was no longer employed by SBIG, which had still not paid her salary nor

reimbursed her for business expenses.[5]  Id. at ¶ 36–38.

Although this case was filed on October 9, 2003, defendants Shaheen and SBIG did not

file an answer in this Court until February 13 2004.  Therein, the defendants denied all of the

misconduct alleged by Samra.  Also in February 2004, Shaheen contacted Hani Ayoub

("Ayoub"), one of Shaheen's long-time business associates who also happened to be Samra's

cousin-in-law.  See Pl.'s Mot. to Enforce Settlement ("Pl.'s Mot."), Ex. A (Ayoub Decl.), at ¶ 2;

Def.'s Opp. to Pl.'s Mot. ("Def.'s Opp."), Ex. A (Shaheen Decl.), at ¶ 5.  According to Ayoub,

Shaheen agreed to the suggestion that Ayoub contact Samra to attempt to resolve the case.  Pl.'s

Mot., Ex. A (Ayoub Decl.), at ¶ 3.  Ayoub telephoned Samra, who informed Ayoub that she was

willing to settle the case for $250,000.  Id. at ¶ 4.  When Ayoub informed Shaheen of Samra's

position, Ayoub claims that Shaheen authorized Ayoub to make a counteroffer of $50,000, which

Samra rejected.  Id. at ¶¶ 5–6.

---

[5]By this point, Samra was owed three months salary as well as out-of-pocket expenses that she incurred on behalf of SBIG.  Compl. at ¶ 38.

Ayoub then arranged for Samra and Shaheen to meet face-to-face in London on February 15, 2004 to conduct further settlement negotiations. See Pl.'s Mot., Ex. A. (Ayoub Decl.), at ¶ 7. However, the parties have conflicting stories as to what, if anything, was actually agreed upon at the London meeting.[6] Samra, corroborated by Ayoub, contends that at the London meeting Shaheen indicated that Ayoub was acting as Shaheen's agent for the purpose of resolving the dispute with Samra. See Pl.'s Mot. at 3; Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶8; Pl.'s Reply, Ex. A (Samra Decl.), at ¶ 13. Samra alleges that, through Ayoub, Shaheen ultimately offered to settle the case for $150,000, and that she accepted this offer thereby forming the agreement that Samra is now asking the Court to enforce. See Pl.'s Mot. at 5 ("...Defendants agreed, through their agent, Ayoub, to pay Plaintiff $150,000 to settle the case); id. at 6 (same); Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶¶ 9–10; Pl.'s Reply, Ex. A (Samra Decl.), at ¶ 15. This purported agreement was executed when Ayoub telephoned Samra, who had returned to Florida shortly after the London meeting, made the offer of a $150,000 settlement, and secured Samra's acceptance. See Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶¶ 8–10.

Defendant Shaheen, however, denies that he appointed Ayoub to be his agent or authorized Ayoub to take any action on behalf of either Shaheen or SBIG; see Def.'s Opp., Ex. A (Shaheen Decl.), at ¶¶ 7, 21; that he ever agreed to an "American style settlement"; see id. at ¶ 22; and that he ever agreed to any specific settlement amount. See id. at ¶¶ 16, 19, 21. Thus, the

---

[6]For example, there is a factual dispute concerning what Shaheen said at the London meeting about Ayoub's authority to act on Shaheen's behalf in future settlement discussions with Samra. Compare Pl.'s Mot. at 3; Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶8 ("Shaheen told Samra that I would handle the settlement negotiations for him); Pl.'s Reply, Ex. A (Samra Decl.), at ¶ 13 ("During the London meeting, Shaheen told all of us ... that Ayoub would handle the settlement negotiations for Defendants going forward."); with Def.'s Opp., Ex. A (Shaheen Decl.), at ¶ 16 ("At the [London] meeting, I told everyone present that, if Ms. Samra dismissed the lawsuit unconditionally and immediately, I would confer with Mr. Ayoub and we would make a fair and reasonable contribution to address Ms. Samra's economic difficulties. I specifically refused to talk about dollar figures at that time and I specifically said that I did not see this as a "settlement." I viewed what we proposed to do as a humanitarian or charitable activity.").

issue before the Court is whether there is a valid settlement agreement between the parties and, if so, whether the defendants have breached that agreement such that enforcement of the settlement by this Court is an appropriate remedy.

Upon thorough review of the facts and applicable law, the Court finds that Ayoub, acting with apparent authority to negotiate with Samra as Shaheen's agent, formed a legally valid settlement agreement with Samra to which Shaheen is bound by operation of agency principles. The Court further concludes that Samra, the proponent of specific enforcement, has satisfied her burden to demonstrate the existence and terms of the agreement by a preponderance of the evidence, and that the agreement may therefore be enforced by order of this Court. Finally, as the agreement is ambiguous with respect to the order in which the parties are to tender their respective performances, the Court will fashion an order requiring simultaneous performance of the plaintiff's and defendants' contractual obligations under the settlement. The Court concludes that this form of remedy affords the maximum fairness and protection to each party, while best effectuating their contractual intent, in accordance with applicable principles of contract law.

## II.  Analysis

**A.     The Motion to Enforce the Settlement Agreement: Threshold Matters**

It is well established that federal district courts have the authority to enforce settlement agreements entered into by litigants in cases pending before them. See Autera v. Robinson, 419 F.2d 1197, 1200, 1200 n.9 (D.C. Cir. 1969) (collecting cases from various federal circuits). Parties seeking enforcement of a settlement agreement have no right to a jury trial because the relief sought is equitable in nature. See Quijano v. Eagle Maintenance Servs., Inc., 952 F. Supp. 1, 3 (D.D.C. 1997). "[T]he right to have a jury determine issues of fact turns essentially on

whether the claim to which those issues relate is legal or equitable."  Hensley v. E.R. Carpenter

Co., Inc., 633 F.2d 1106, 1110 n.5 (5th Cir. 1980) (as quoted in Quijano, 952 F. Supp. at 3).  An

action to enforce a settlement agreement is, at bottom, an action seeking the equitable remedy of

specific performance of a contract.  See Quijano, 952 F. Supp. at 3 (quoting Adams v. Johns-

Manville Corp., 876 F.2d 702, 709 (9th Cir. 1989); Hensley, 633 F.2d at 1110 n.5).  This is the

case even where, as here, the opposing party disputes certain facts related to the formation of the

settlement contract.  See id., Hensley, 633 F.2d at 1110 n.5.

The party moving for enforcement of a settlement agreement bears the burden of

showing, by clear and convincing evidence, that the parties in fact formed a binding agreement in

resolution of all the disputed issues in the underlying litigation.  Quijano, 952 F. Supp. at 3

(citing Anschutz v. Radiology Associates of Mansfield, Inc., et al., 827 F. Supp. 1338, 1343

(N.D. Ohio 1993)).  In most cases, a district court can enforce a settlement agreement summarily.

See Autera v. Robinson, 419 F.2d 1197, 1200 (D.C. Cir. 1969).  However, "[w]hen there is a

genuine dispute about whether the parties have entered into a binding settlement, the district

court must hold an evidentiary hearing that includes the opportunity for cross-examination."

United States v. Mahoney, 247 F.3d 279, 285 (D.C. Cir. 2001).  Summary proceedings are

inappropriate when the existence of the settlement is genuinely disputed, as the Court's equitable

enforcement powers extend only to "complete settlement agreements"—that is, agreements about

whose existence there is no genuine dispute.  See Quijano, 952 F. Supp. at 4 (citing Ozyagcilar v.

Davis, 701 F.2d 306, 308 (4th Cir. 1983); Gardiner v. A.H. Robins Co., 747 F.2d 1180, 1189

(8th Cir. 1984)).  Where there is such a genuine dispute regarding the existence of an enforceable

settlement agreement, the Court "must have the opportunity to make credibility determinations

and the parties should be afforded the benefit of cross-examination so that factual issues may be adequately explored."  Id.; Autera, 419 F.2d at 1202.

In Quijano, our court treated the presence or absence of a factual dispute between the parties concerning the existence and validity of a purported settlement agreement as something akin to a jurisdictional matter—that is, the court held that the presence of such a factual dispute somehow necessarily precludes a showing by clear and convincing evidence that a binding settlement agreement was created by the parties.  See Quijano, 952 F. Supp. at 4.  However, it does not seem that any factual dispute, regardless of its nature, should, as an analytic or definitional matter, always undercut the possibility that the moving party could prove the existence of an enforceable agreement by clear and convincing evidence.

"Clear and convincing evidence," after all, does not mean "undisputed" or "undisputable" evidence.  Rather, at least in our jurisdiction, the "clear and convincing evidence" standard of proof requires that the party bearing the burden of proof on a given issue present evidence sufficient to allow the court to "reach a firm conviction of the truth on the evidence about which [it] is certain."  United States v. Montague, 40 F.3d 1251, 1255 (D.C. Cir. 1994) (relying on Black's Law Dictionary 251 (6th ed. 1990), which defines clear and convincing evidence as "proof which results in a reasonable certainty of truth").  A "firm conviction" or a "reasonable certainty" are not the same as an "absolute certainty," and so it follows that the presence of factual disputes cannot necessarily or definitionally preclude a showing, by clear and convincing evidence, of the existence of a valid settlement agreement.  For this reason, the existence or lack of factual disputes concerning the validity of a settlement agreement cannot, ex ante, require that the Court hold an evidentiary hearing to resolve a motion to enforce that agreement.  Rather, the

Court must first determine whether, despite whatever factual disputes may exist, the moving

party has nevertheless carried the burden of proving the existence of a settlement agreement by

clear and convincing evidence.

In this jurisdiction, "[w]hether parties have reached a valid settlement is a question of

contract law." United States v. Mahoney, 247 F.3d 279, 285 (D.C. Cir. 2001); Village of

Katovik, 689 F.2d at 47, 47 n.62 (citing a number of cases from the United States Supreme Court

and various circuits other than the District of Columbia Circuit; holding that "the enforceability

of a settlement agreement is governed by familiar principles of contract law").  The requirements

of a proper showing of the existence of an enforceable settlement agreement, then, are

determined by reference to substantive state contract law.  Of course, the necessary elements of a

valid contract may vary across jurisdictions, and so the Court must first determine which

jurisdiction's substantive contract law governs the case in order to determine what the moving

party must show in order to demonstrate the existence of a valid settlement agreement.  A choice

of law analysis, then, is a necessary part of the Court's inquiry here.

**B.      Choice of Law**

Although both parties apparently take for granted in their papers that the law of the

District of Columbia governs the enforceability of the purported settlement agreement, this Court

would be remiss in ignoring the question of what law appropriately applies to this matter.  Thus,

the Court will now address the choice of law issue, before applying the correct jurisdiction's

legal standards to the question whether a binding settlement agreement was in fact formed in this

case.

To be sure, the D.C. Circuit applied District of Columbia law in determining the enforceability of a settlement agreement in <u>Makins v. District of Columbia</u>.  <u>See</u> 277 F.3d 544, 548 (D.C. Cir. 2002).  In that case, the Court of Appeals held only that settlement agreements should be governed by contract law and that state, rather than federal, law should govern such disputes.  <u>See</u> <u>Makins</u>, 277 F.3d at 547–48.  The Court of Appeals then applied District of Columbia law without further discussion.  The plaintiff relies upon <u>Makins</u> for the proposition that District of Columbia law should govern the issue of the enforceability of the purported settlement agreement in this case as well, and the defendant seems to take the applicability of District of Columbia law as a given.  <u>See</u> Pl.'s Mot. at 5 n.1; Def.'s Opp. at 8–9.

Momentary scrutiny of the <u>Makins</u> decision reveals, however, that the Court of Appeals did not enunciate a <u>general</u> choice-of-law rule in deciding that District of Columbia law should apply in that case.[7]  Rather, because the plaintiff in <u>Makins</u> was a D.C. employee and resident

---

[7]In fact, such a holding would be quite counterintuitive.  Elsewhere, the D.C. Circuit has held that settlement agreements are governed by state contract law and are to be enforced in the same manner as typical contracts.  <u>See</u> <u>United States v. Mahoney</u>, 247 F.3d 279, 285 (D.C. Cir. 2001).  Where several states' substantive contract law is potentially applicable in a contract dispute, our Circuit holds that federal courts in the District of Columbia should apply the local choice of law rules of the District of Columbia courts.  <u>See</u> <u>Young Women's Christian Ass'n of the National Capital Area v. Allstate Ins. Co.</u>, 275 F.3d 1145, 1150 (D.C. Cir. 2002) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941)).  Under the choice of law rules of the District, in contract cases the substantive law of the state having the "more substantial interest" in the resolution of the issues governs.  <u>Eli Lilly & Co. v. Home Ins. Co.</u>, 764 F.2d 876, 882 (D.C.Cir.1985) (citing <u>Fowler v. A & A Co.</u>, 262 A.2d 344, 348 (D.C.1970); <u>Duncan v. G.E.W., Inc.</u>, 526 A.2d 1358, 1363 (D.C.1987)).  Thus, in lawsuit seeking enforcement of a contract that is not a settlement agreement, there is no default rule that the substantive contract law of the District of Columbia will govern—to the contrary, District law provides that some other state's law will govern so long as that state has the "more substantial interest" in the outcome of the case.

It follows that there should be no such default preference for District of Columbia contract law in actions for the enforcement of settlement agreements.  There is no established distinction between a settlement contract and any other contract in the law of this Circuit, nor is there a functional distinction to be made between settlements and, say, contracts transferring interests in real property simply by virtue of the fact that the former only arise out of underlying litigation concerning other, distinct matters.  That is, simply because the circumstances that give rise to a settlement agreement in this jurisdiction, namely the existence of some underlying piece of litigation, usually occur within the geographical boundaries of the District of Columbia, it does not follow that the District of Columbia automatically has the "more substantial interest" in the resolution of the issue of whether or not a settlement agreement is enforceable.  After all, the substantive law of some other jurisdiction may govern the underlying litigation as well, as in the case of a contract dispute in which Georgia, for example, is found to have the "more

suing the District under Title VII of the Civil Rights Act, no choice-of-law question was presented or in the offing.  See Makins, 277 F.3d at 545–46 (recounting the facts of the case).[8] Here, however, matters are a bit more complicated.

Again, in this jurisdiction, "[w]hether parties have reached a valid settlement is a question of contract law."  United States v. Mahoney, 247 F.3d 279, 285 (D.C. Cir. 2001); Village of Katovik, 689 F.2d at 47, 47 n.62.  Accordingly, the Court will apply the "familiar" choice of law principles that it would apply in a normal contract case to the issue of what jurisdiction's law governs the validity of the purported settlement agreement at issue here.  See Lee v. Hunt, 621 F.2d 1171, 1173–74 (5th Cir. 1980) (applying choice of law rules for contract cases to determine appropriate state law applicable to dispute over validity of settlement agreement).

Where, as here, there is diversity of citizenship among the parties, the applicable choice of law rules are those of the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487,

---

substantial interest."  Indeed, in a parallel situation, namely the construction of an immunity agreement executed during a criminal prosecution, our court did not simply adopt the contract law of the District of Columbia as a default because the agreement at issue arose out of events in an underlying piece of litigation in the District.  See United States v. Oruche, 257 F. Supp. 2d 230, 239 n.7 (holding that, under District of Columbia choice of law rules, the immunity agreement should be governed by D.C. contract law because it was "drafted and executed" in D.C., not simply because it arose out of underlying litigation in a court sitting in the District).  It would be analytically inconsistent to insist that the substantive contract law of the District must apply to settlement agreements because they are settlement agreements, when the law of any other state may be applied to a regular contract dispute according to the law of this Circuit, and when there is no meaningful distinction between a dispute over the validity of a settlement agreement and a regular contract dispute.

[8]One might think that the parties' identical reliance on the Makins decision for the proposition that District of Columbia contract law governs in this case constitutes an agreement between parties to a contract on a choice of substantive law, tantamount to the inclusion of a choice of law clause that should be given effect by the Courts under the general approach.  See Vaughn v. Nationwide Mut. Ins. Co., 702 A.2d 198, 200–201 (D.C. App. 1997) (adopting the approach set forth in section 187 of the Second Restatement of Conflict of Laws, namely that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in the agreement directed to that issue"); see also Nat'l Equipment Rental Ltd. v. Szukhent, 375 U.S. 311, 315–16 (1964) ("...it is settled ... that parties to a contract may agree in advance to submit to the jurisdiction of a given court ....").  However, both parties' interpretation of the holding of Makins is erroneous, and thus their reliance on that case constitutes not so much an agreement over a choice of law as an ill-informed stipulation that certain legal principles dictate a choice of law.  As such, the parties' reliance on Makins does not give this Court any reason to eschew the choice of law analysis.  To the contrary, in order to prevent future misconstruction of the law in this area, the Court is bound to set forth the correct legal principles applicable to the issue of choice of law in actions to enforce settlement agreements in this jurisdiction.

496 (1941); <u>Lee v. Flintkote Co.</u>, 593 F.2d 1275, 1278–79 (D.C. Cir. 1979).  Under District of

Columbia law, the first step in the analysis requires that the Court determine whether there is any

conflict among the potentially applicable legal standards.  <u>Young Women's Christian Assoc. Of

the Nat'l Capital Area, Inc. v. Allsate Ins. Co. of Canada</u>, 275 F.3d 1145, 1150 (D.C. Cir. 2002)

(citing <u>Eli Lilly & Co. v. Home Ins. Co.</u>, 764 F.2d 876, 882 (D.C. Cir. 1985)); <u>Fowler v. A & A

Co.</u>, 262 A.2d 344, 348 (D.C. 1970); <u>Duncan v. G.E.W., Inc.</u>, 526 A.2d 1358, 1363 (D.C. 1987).

Only if the potentially applicable standards are in conflict will the Court be required to apply the

District of Columbia's choice of law rules to determine which standard governs the issues in the

case.  <u>Id.</u> (citing <u>Nationwide Mut. Ins. Co. v. Richardson</u>, 270 F.3d 948, 953 (D.C. Cir. 2001); <u>Eli

Lilly & Co.</u>, 764 F.2d at 882; <u>Graycoat Hanover F St. Ltd. P'ship v. Liberty Mut. Ins. Co.</u>, 657

A.2d 764, 767–68 (D.C. 1995)).  If a conflict is determined to exist, District of Columbia law

provides that the law of the jurisdiction having the "'more substantial interest' in the resolution

of the issues" will govern contract disputes.  <u>Id.</u>; <u>Owen v. Owen</u>, 427 A.2d 344, 348 (D.C. App.

1981).

 According to the Second Restatement of Conflict of Laws, in contract cases the "contacts

to be taken into account ... to determine the law applicable to an issue include: (a) the place of

contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the

location of the subject-matter of the contract, and (e) the domicile, residence, nationality, place of

incorporation and place of business of the parties."  RESTATEMENT (SECOND) OF CONFLICT OF

LAWS § 188.  Here, then, the relevant jurisdictions for this preliminary inquiry are: (1) Delaware,

the state in which SBIG is incorporated; (2) Florida, the State of the plaintiff's residence and the

state in which the plaintiff accepted the purported settlement offer; (3) the District of Columbia,

the jurisdiction in which the purported employment contract was formed and in which some of the other events giving rise to this litigation occurred; (4) the Kingdom of Jordan, the country of the defendant's residence; and (5) England, the jurisdiction in which the purported settlement agreement was preliminarily negotiated.

To frame this discussion, it should be noted that the purported settlement agreement in this case is wholly oral.  Thus, the question whether oral contracts are enforceable at all under the contract law of the various potentially governing jurisdictions is a dispositive threshold issue. Upon cursory examination, the Court finds at least one conflict between the potentially applicable bodies of law.  That is, under Jordanian law, oral contracts that are non-commercial and exceed ten Jordan dinars in value are not enforceable at all.  See Law of Evidence (Jordan), Art. 28(1) ("If the contractual obligation in non-commercial matters exceeds ten Jordan dinars or is for an undetermined value, oral testimony may not be resorted to so as to prove the obligation ... unless there is an agreement or provision to the contrary.").  Here, the agreement to pay money in exchange for the dismissal of a lawsuit is clearly not commercial, and thus because $150,000 exceeds ten Jordan dinars,[9] the purported settlement would not be subject to proof by oral evidence under Jordanian law.  As this is a wholly oral agreement, then, Jordanian law dictates that the settlement would be unenforceable for lack of effective means to prove its existence.

Of course, under the substantive contract law of most American states, the general rule is that oral contracts are enforceable unless some specific enactment, such as a statute of frauds, renders a specific category of oral contracts unenforceable.  See, e.g., Jack Baker, Inc. v. Office Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1995) ("Absent any contrary requirement under a

---

[9]As of January 31, 2005, ten Jordan dinars was equal to approximately 14.12 U.S. dollars, so that $150,000 U.S. dollars is equivalent to approximately 106,230 Jordan dinars.

statute of frauds, parties may enter into enforceable oral agreements ....”); Koechli v. BIP Int’l, Inc., 870 So. 2d 940, 943–44 (Fla. App. 2004) (“Florida law recognizes that contracts may be validly formed without an express written agreement.”) (citing Nautica Int’l, Inc. v. Intermarine USA., L.P., 5 F. Supp. 2d 1333, 1340 (S.D. Fla. 1998)).  Each of the American state jurisdictions whose law potentially applies in this case has a statute of frauds; and none of those statutes would prohibit the enforcement of an oral settlement like the one purportedly formed between Samra and Shaheen.[10]

Thus, there is a clear conflict between the substantive contract law of Jordan and that of at least two of the American state jurisdictions under consideration here.  As such, there is no single legal standard followed by all the relevant jurisdictions that can be applied to the issues in this case, necessitating a choice-of-law determination.

---

[10]In the District of Columbia, the statute of frauds proscribes enforcement of oral contracts relating to: promises to answer for the debts of third parties; agreements made in consideration of marriage; sales or transfers of interests in real property; agreements that cannot be performed within one year from their formation; the creation of trusts in real property; grants or assignments of trusts in real property; and so forth.  See D.C. CODE §§ 28-3502–28-3505 (2001).  None of these provisions prohibit the enforcement of an oral settlement agreement in which one party agrees to pay money in exchange for the other party’s dismissal of pending civil claims.  In fact, oral settlement agreements are generally held to be enforceable in the District of Columbia.  See, e.g., Jack Baker, 664 A.2d at 1238; Sims v. Westminster Investing, 648 A.2d 940, 943 n.7 (D.C. 1994) (“Of course, an oral, out-of-court settlement agreement to settle litigation may be enforced.”) (citing Brown v. Brown, 343 A.2d 59 (D.C. 1975)); see also Center for Marine Conservation v. Brown, 905 F. Supp. 383, 386 n.3 (S.D. Tex. 1995) (applying District of Columbia law; holding that oral settlement agreements are enforceable under D.C. law).

The statutes of frauds of both Florida and Delaware are nearly identical, and neither would require a settlement agreement of the kind involved in this case to be reduced to writing in order to be enforceable.  See 6 DEL. C. §§ 2714(a)–(b) (2004); FLA. STAT. ANN. § 725.01 (2004).  Indeed, Florida Rule of Judicial Administration 2.060(g) explicitly excepts oral settlement agreements from the general rule that agreements between parties to litigation must be in writing or made in open court on the record.  See FLA. R. JUD. ADMIN. 2.060(g) (“No private agreement or consent between parties or their attorneys concerning the practice or procedure in an action shall be of any force unless the evidence of it is in writing ....  This rule shall not apply to settlements or other substantive agreements.”).  Of course, oral settlement agreements are not enforceable in Florida or the District of Columbia where the terms of the agreement bring it within the prohibitions of the applicable statute of frauds.  See, e.g., Perimeter Investments, Inc. v. Amerifirst Dev. Co. of Central Florida, Inc., 423 So. 2d 586, 587–88 (Fla. App. 1982) (invalidating oral settlement agreement involving transfer of interest in real property as prohibited by statute of frauds).

For choice of law issues in contract cases, the District of Columbia has adopted section 188 of the Second Restatement of Conflict of Laws.  See Finance Am. Corp. v. Moyler, 494 A.2d 929, 929, 929 n.7 (D.C. 1985).  Where, as here, there is no specification by the parties of which jurisdiction's law will govern their agreement, the Restatement approach requires that the Court evaluate the nature of the various potentially governing jurisdictions' "contacts" with the subject matter of the controversy and determine, on the basis of that evaluation, which jurisdiction has the "more substantial interest" in the resolution of the issues.  See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188; Ideal Electronic Sec. Co., Inc. v. Int'l Fidelity Ins. Co., 129 F.3d 143, 148 (D.C. Cir. 1997) (applying District of Columbia choice of law rules for contract cases).  As noted above, under the Second Restatement approach adopted in the District, the Court should consider the locations of contract formation, negotiation, principal performance, the contract's subject matter, and the residences or places of incorporation of the parties to the contract in determining which jurisdiction has the "more substantial interest" in the dispute.  See RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188.[11]  Applying these principles to the present case, the Court concludes that Florida is the jurisdiction with the "more substantial interest" in the agreement at issue here and thus that the substantive contract law of Florida governs the purported settlement agreement.

Samra resides in Florida and Shaheen in Jordan.  The purported settlement agreement was executed in Florida when Samra accepted Ayoub's offer, allegedly made on Shaheen's behalf,

---

[11]So that the Court's discussion of such factors as "place of negotiation," "place of execution," and so forth will make a degree of sense, the following choice of law analysis will proceed on the assumption that the settlement agreement at issue here is a valid contract.  The Court will return to the dispute concerning the validity of the agreement after determining which jurisdiction's substantive law will govern that dispute.

over the telephone.[12]   Contract negotiation took place partly in London, Florida, and Jordan.

That is, the London meeting constituted an unsuccessful "first round" of settlement negotiations,

while Ayoub's telephone conversation with Samra after the London meeting served as the final

bit of negotiation, which resulted in Samra's acceptance of an offer and formation of the

agreement (presumably, Ayoub called from his home in Jordan, although this is unclear from the

record; it is clear that Samra conducted her end of the conversation from Florida).

Of the greatest importance for the choice of law inquiry, however, is the place where the

parties were to perform their respective obligations under the agreement.  See Frank E. Basil,

Inc., v. Guadino, 424 A.2d 70, 77 n.12 (D.C. 1980) (discussing Ury v. Jewelers Acceptance

Corp., 227 Cal. App. 2d 11 (Cal. Ct. App. 1964); rejecting the argument that Ury stands for the

proposition that the place of contract formation is central to the choice of law inquiry, finding

instead that the place of principal performance is most important in determining what law should

govern contract disputes).  Assuming that the purported settlement agreement is valid, Shaheen is

obligated under the contract to pay Samra $150,000 and Samra is obligated under the contract to

dismiss her underlying lawsuit against Shaheen.  The order in which these performances would

be owed is irrelevant for choice of law purposes, but will be addressed in the discussion of the

merits below.  What is important for this discussion is the location in which each party's

performance would occur.

---

[12]Under the Second Restatement of Conflict of Laws, courts should determine the "place of contracting" according to the law of the state in which the court is located.  See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188, cmt. e ("... the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect ...").  In the District of Columbia, as in most other states, a contract is formed when the offer is accepted.  See Malone v. Saxony Co-op Apartments, Inc., 763 A.2d 725, 728 (D.C. 2000) ("[T]o form a contract the offeree must convey to the offeror his acceptance of the offer."); see also Cinciarelli v. Carter, 662 F.2d 73, 78 (D.C. Cir. 1981) ("It is an elementary principle of contract law that acceptance of an offer creates a binding contract ....").  Thus the "place of contracting" is the place of acceptance of the offer.

According to established contract principles, the payor's performance under a contract to pay money is only completed once payment is actually received by the payee.  See 28 WILLISTON ON CONTRACTS § 72.45.[13]  With respect to Shaheen's owed performance, both Samra and Ayoub indicate that Shaheen planned to forward payment to Samra by wire transfer from Jordan.  See Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶ 10; Pl.'s Reply, Ex. A (Samra Decl.), at ¶ 15.  Samra would thus receive payment in Florida, the state of her residence, once the funds are actually credited to her bank account after the transfer.  Samra's owed performance, namely the dismissal of her lawsuit against Shaheen, would similarly be completed in Florida.  While Samra is represented by local counsel in the District of Columbia, she does not reside here and, presumably, does not travel to the District each time she discusses this case with her attorneys.  If she were to authorize dismissal of the underlying claims in this litigation pursuant to a settlement agreement, she would most likely do so by telephone, and perhaps by facsimile if there were documents for her to sign.  In either case, all of the acts that Samra would have to perform to dismiss her lawsuit against Shaheen would most likely be performed in Florida, where she resides.  The only actions

---

[13]In the case of a bilateral contract under which one party is obligated to pay money, a tender of payment is not the same thing as a payment, because "technically, a tender of payment has not yet been accepted [by the payee], while payment has."  See 28 WILLISTON ON CONTRACTS §72.27 (4th ed. 2004) (citing State v. Lex Assocs., 730 A.2d 38 (Conn. 1999); Rissman on behalf of Rissman Inv. Co. v. Kilbourne, 643 So. 2d 1136 (Fla. App. 1994)).  To make the distinction between tender and payment clear, imagine that the party obligated under the contract to pay money gives the payee a check for the proper amount.  While giving the check to the payee is a valid tender of performance, see 28 WILLISTON ON CONTRACTS § 72.29 (discussing the essential elements of a valid tender), valid tender alone does not discharge the payor's obligation under the contract.  See id. § 72.45 ("a tender of performance of an obligation to pay money ... does not [discharge the obligation to pay]").  Rather, the obligation to pay is not fully performed, and thus discharged, until the check is honored by the drawee bank.  See id.  Put generally, then, an obligation to pay money is not discharged until the payee actually receives the money.  After all, a tender of performance may be refused by the obligee, in which case the obligor will have rights to enforce the contract against the obligee.  Or, a seemingly valid tender may not result in actual payment, that is, in the receipt of the amount owed by the payee, because the payor's instrument of tender may be dishonored by the drawee bank or may be otherwise invalid.  Thus, the contractual obligation to pay money is not fully performed until actual payment is received by the payee.  In the case of a wire transfer from one bank to another, then, payment is not received, and performance of the payor's contractual obligation is not complete, until the funds are credited to the payee's account or otherwise made available to the payee.

taken in the District of Columbia would be the relatively ministerial tasks performed by her

attorneys, such as preparing and filing a stipulation of voluntary dismissal in this Court.  Samra's

owed performance under the contract, however, amounts to no more than taking whatever actions

are necessary to cause the lawsuit to be dismissed.  Thus, both parties' performance under the

contract will most likely be completed in Florida.

Florida, then, is Samra's state of residence, the location of contract formation, and the

location of principal performance.  No other jurisdiction whose law is potentially applicable here

comes close to Florida's volume of contacts with the disputed settlement agreement.  Delaware is

the state in which one defendant, SBIG, is incorporated; and the District of Columbia is the

location of the court in which the lawsuit giving rise to the settlement agreement and the action

for enforcement of that agreement are pending.  Jordan is the country of residence of Shaheen,

the other defendant in the underlying lawsuit; and Great Britain is the country in which some

negotiation of the purported settlement agreement occurred.  On balance, however, Florida has

the greater weight of the contacts with the agreement at issue here, and thus is the jurisdiction

with the "more substantial interest" in the resolution of this dispute under the District of

Columbia's choice of law principles.  Thus, Florida law must govern the purported settlement

agreement, and all disputes related to the existence and terms of that agreement will be

determined under the substantive law of Florida.

## C.      The Merits

Under Florida law, "settlements are highly favored and will be enforced whenever

possible." Robbie v. City of Miami, 469 So. 2d 1384, 1385 (Fla. 1985) (citing Pearson v.

Ecological Science Corp., 522 F.2d 171 (5th Cir.1975), cert. denied, 425 U.S. 912 (1976)); Long

Term Mgt., Inc. v. Univ. Nursing Ctr., Inc., 704 So. 2d 669, 673 (Fla. App. 1997).  Nevertheless, "a valid [settlement] agreement is a predicate to an order of enforcement." Bateski by and through Bateski v. Ransom, 658 So. 2d 630, 631 (Fla. App. 1995).  In Florida, as in the District of Columbia, settlement agreements are governed by substantive state contract law. Id., Don L. Tullis & Assocs., Inc. v. Benge, 473 So. 2d 1384, 1386 (Fla. App. 1985); Williams v. Ingram, 605 So. 2d 890, 893 (Fla. App. 1992); Schwartz v. Florida Bd. of Regents, 807 F.2d 901, 905 (11th Cir. 1987) (applying Florida law).  Oral settlement agreements are generally held to be valid and enforceable so long as the essential elements of a contract are shown, FLA. R. JUD. ADMIN. 2.060(g); Bankers Sec. Ins. Co. v. Brady, 765 So. 2d 870, 872–73 (Fla. App. 2000); Boyko v. Ilardi, 613 So. 2d 103, 104 (Fla. App. 1993); with the proviso that Florida's Statute of Frauds applies to a settlement agreement in the same way it applies to other contracts, Perimeter Invs. Inc. v. Amerifirst Dev. Co. of Central Fla., 423 So. 2d 586, 587.[14]

The party seeking enforcement of the settlement bears the burden of demonstrating that a valid, binding agreement was formed. Spiegel v. H. Allen Holmes, Inc., 834 So. 2d 295, 297 (Fla. App. 2002); Williams, 605 So. 2d at 893.  According to Florida contract law, a settlement agreement is only enforceable if it is "sufficiently specific and the parties ... mutually agree on every essential element." Spiegel, 834 So. 2d at 297; Bateski, 658 So. 2d at 631 (citing Benge, 473 So. 2d at 1386).  The proponent of enforcement must show that "the opposing party assented to the terms of the agreement." Spiegel, 834 So. 2d at 297; see also Williams, 605 So. 2d at 893 ("The moving party must establish a meeting of the minds or mutual or reciprocal assent to a

---

[14]The Statute-of-Frauds issue has not been raised by the opponent to the motion to enforce the settlement agreement, but as was discussed above, note 10 supra, such an objection would be unavailing in any event.  No provision of the Florida Statute of Frauds requires that a contract to exchange money for the dismissal of pending civil claims must be reduced to writing to be enforceable. See generally FLA. STAT. ANN. § 725.01 (2004).

certain and definite proposition."); <u>Carroll v. Carroll</u>, 532 So. 2d 1109, 1109 (Fla. App. 1988),

<u>rev. denied</u>, 542 So. 2d 1332 (Fla. 1989).  Because the enforcement of settlement agreements is

governed by general contract law, Florida courts uniformly require that the proponent

demonstrate the existence of a valid agreement by a preponderance of the evidence, which is the

standard of proof applied in other contract cases.  <u>See</u> <u>Williams</u>, 605 So. 2d at893 n.2 (criticizing

one Florida appellate court's application of the "clear and convincing" standard of proof in an

action to enforce a settlement agreement for departing from the uniform practice).

The Supreme Court of Florida has "consistently held that an objective test is used to

determine whether a contract is enforceable."  <u>Robbie</u>, 469 So. 2d at 1385 (citing <u>Blackhawk</u>

<u>Heating & Plumbing Co. v. Data Lease Fin. Corp.</u>, 302 So. 2d 404, 407 (Fla. 1974)).  More

specifically, "[t]he making of a contract depends not on the agreement of two minds in one

intention, but on the agreement of two sets of external signs—not on the parties having meant the

same thing but on their having said the same thing."[15]  <u>Blackhawk</u>, 302 So. 2d at 407 (quoting

---

[15]At various points in both his opposition to the plaintiff's motion and his declaration in support thereof, Shaheen makes the argument that he never intended to enter into "a formal, American-style settlement," but rather that he viewed the deal of giving Samra a sum of money as "a humanitarian or charitable activity."  <u>See</u> Def.'s Opp., Ex. A (Shaheen Decl.), at ¶¶ 6, 8, 16, 22.  However, under Florida's objective test for the existence of a contract, "evidence of the unilateral secret intent of a party ... is in and of itself immaterial to the actual creation of a contract." Shaheen seems to be arguing that the offer to pay Samra money was intended as an offer to make a gift, that is, as a gratuitous promise.  However, it is the logical structure of the agreement or exchange, and not the private intent of one of the parties that is unknown to the other, that determines whether an arrangement is an enforceable contract or an unenforceable gratuitous promise.  <u>See</u> RESTATEMENT (SECOND) OF CONTRACTS §§ 17, 19(3), 72.  More specifically, a contract will be enforceable if there is a "manifestation of mutual assent and a consideration."  <u>Id.</u> § 17(1).  A manifestation of assent to an exchange of, say, a promise for a return promise, may be made by words or conduct.  <u>Id.</u> § 19.  An enforceable contract is formed when the parties assent to the terms of the exchange, that is, to the obligations they will owe under the contract; and the parties' unexpressed lack of intent to be legally bound to those obligations does not render them any less enforceable.

When a person accepts consideration of some kind in exchange for a promise to do something, so long as the promisor assented to the arrangement, an exchange has occurred and a contract is formed.  That contract conveys legal rights and imposes legal obligations on both parties, and either party may assert those rights and enforce those duties in court.  If a person intends makes a gratuitous promise—a promise to make a gift to someone else—yet either requires or accepts consideration in exchange for that promise, the party who gives the consideration for what was intended to be a gratuitous promise may thereafter enforce the promisor's promise under contract law.  <u>See</u> RESTATEMENT (SECOND) OF CONTRACTS § 71, cmt. c (provision of consideration in exchange for promise creates

Gendzier v. Bielecki, 97 So. 2d 604, 608 (Fla. 1957)).  While a showing of mutual assent on this objective standard is necessary with respect to the essential terms of the contract, "uncertainty as to an agreement as to nonessential or small items will not preclude a finding of an enforceable settlement."  Spiegel, 834 So. 2d at 297; Williams, 605 So. 2d at 893.

In the present case, the dispute concerning whether a valid settlement agreement was formed in the first place turns on whether or not Ayoub was acting as Shaheen's agent when he telephoned Samra with the offer and secured her acceptance.  While Ayoub and Samra both contend that Ayoub was actually authorized by Shaheen to negotiate and execute a settlement agreement, Shaheen argues that he never granted Ayoub such authority.  Florida law adheres to the general rule that "a principal is bound by the acts of its agent that are within the course and scope of the agency."  Roessler v. Novak, 858 So. 2d 1158, 1161 (Fla. App. 2003) (citing Jaar v. Univ. of Miami, 474 So. 2d 239 (Fla. App. 1985)).  The liability of a principal to a third party may be based upon the actions of an agent taken pursuant to either the agent's actual or apparent authority.  See id.; Taco Bell of Cal. v. Zappone, 324 So. 2d 121, 123 (Fla. App. 1975).

Under Florida law, the existence of an agency relationship is determined by the trier of fact.  Villazon v. Prudential Health Care Plan, Inc., 843 So. 2d 842, 853 (Fla. 2003) (citing Orlando Executive Park, Inc., v. Robbins, 433 So. 2d 491, 494 (Fla. 1983).  Florida courts normally leave the question of the existence of an agency relationship for the jury to decide.  Rodriguez v. Tombrink Enterprises, Inc., 870 So. 2d 117, 120 (Fla. App. 2003).  On a motion to

---

enforceable contract despite promisor's intent to make a gratuitous promise).  Thus, Shaheen's intent to make a financial gift to Samra cannot render his promise a legally unenforceable gratuitous promise —because he both demanded and received Samra's promise to dismiss her lawsuit against him in exchange for his promise to pay money, Samra gave consideration for that promise and a contract was formed.  Of course, Shaheen disputes that he ever assented to the agreement on its terms, and that argument will be discussed below.  The foregoing analysis is only concerned with the argument that Shaheen made only a gratuitous promise that could not be part of a legally binding contract.

enforce a settlement agreement, however, the parties have no right to a jury, and thus the Court is the finder of fact.  "The existence of an agency [relationship] may be shown by any substantial evidence, either direct or circumstantial." Sugarland Real Estate v. Beardsley, 502 So. 2d 44, 45 (Fla. App. 1987) (internal quotation omitted); Bradley v. Waldrop, 611 So. 2d 31, 32–33 (Fla. App.1992).  "A [fact-finder] is entitled to infer from the facts and circumstances of the case the existence of an agency [relationship] even where the alleged principal and agent both deny the existence thereof."  Sugarland, 502 So. 2d at 46.

To demonstrate that an agent had actual authority to bind the principal by the agent's actions, one must show: (1) that the principal acknowledged that the agent would act for him or her; (2) that the agent accepted the undertaking; and (3) that the principal exercised control over the agent's actions.  Amstar Ins. Co. v. Cadet, 862 So. 2d 736, 741 (Fla. App. 2003); Villazon, 843 So. 2d at 853 n.10 (quoting Goldschmidt v. Holman, 571 So. 2d 422, 424 n.5 (Fla. 1990)); see also RESTATEMENT (SECOND) OF AGENCY § 1 (1957).  Clearly, Samra has not established these three elements by a preponderance of the evidence.  While Ayoub asserts that Shaheen empowered Ayoub to negotiate with Samra on Shaheen's behalf, Shaheen contends that he never authorized Ayoub to act for him in negotiations with Samra, creating a factual dispute as to whether Ayoub had actual authority to bind Shaheen to any contract with Samra.  See Def.'s Opp., Ex. A (Shaheen Decl.), at ¶¶ 7, 21.  The Court cannot resolve this factual dispute on the present record.

Samra argues in the alternative, however, that Shaheen may be held bound to the settlement agreement on the basis of Ayoub's apparent authority to act as Shaheen's agent. "Apparent authority is authority which a principal knowingly tolerates or permits, or which the

22

principal by its actions or words holds the agent out as possessing." Roessler, 858 So. 2d at 1161

(citing Taco Bell, 324 So. 2d at 123)[16].  The appearance of an agency relationship and of

corresponding authority to act on behalf of the principal can be created "when the principal

knowingly permits the agent to act as if the agent is authorized, or 'by silently acting in a manner

which creates a reasonable appearance of an agent's authority.'"  Ja Dan, Inc. v. L-J Inc., 898 F.

Supp. 894, 900 (S.D. Fla. 1995) (applying Florida law).  The doctrine of apparent authority

functions to estop a principal from denying "the authority of the agent when the principal

permitted an appearance of authority in the agent and, in so doing, justified a third party's

reliance upon that appearance of authority as if it were actually conferred upon the agent."  Id.

(citing Liberty Mut. Life Ins. Co. v. Sommers, 472 So. 2d 522, 524 (Fla. App. 1985)).  Where a

third party enters into an agreement in reliance on the apparent authority of an agent to contract

on behalf of the principal, that agreement is enforceable against the principal.  See

---

[16]The Second Restatement of Agency makes clear that the doctrine of apparent authority does not require the principal to make a "holding out to the world" that an individual is his agent.  Rather,

> anyone who learns the facts which create apparent authority can properly enter into transaction with the pseudo-agent, in the same was that an offer made broadcast can be accepted by anyone who learns of it and who can satisfy the terms of the offer.  Anyone who has relied upon appearances for which the principal is responsible can acquire rights against the principal by dealing with an unauthorized agent.

RESTATEMENT (SECOND) OF AGENCY § 159 cmt. b (1958).

RESTATEMENT (SECOND) OF AGENCY § 159.[17]  See, e.g., Sugarland, 502 So. 2d at 46; Warren v.

Dept. of Admin., 554 So. 2d 568, 571 (Fla. App.1989).

　　　To demonstrate apparent authority, the proponent must establish that: (1) the principal

made some representation that a reasonable person would perceive to acknowledge or affirm the

authority of the purported agent to act on the principal's behalf; (2) the proponent relied on that

representation in dealing with the agent; and (3) the proponent materially changed position in

reliance on the principal's representation.  See Mobil Oil Corp. v. Bransford, 648 So. 2d 119, 121

(Fla. 1995); Fidelity & Casualty Co. v. D.N. Morrison Const. Co., 156 So. 2d 385, 387 (Fla.

1934); H.S.A., Inc. v. Harris-in-Hollywood, Inc., 285 So. 2d 690, 692–93 (Fla. App. 1973);

Roessler, 858 So. 2d at 1161; Ideal Foods Inc. v. Action Leasing Corp., 413 So. 2d 416, 418 (Fla.

App. 1982).  With respect to the first element, it is important to note that "apparent authority

does not arise from the subjective understanding of the person dealing with the purported agent,

nor from the appearance created by the purported agent himself; instead, apparent authority only

exists where the principal creates the appearance of an agency relationship."  Ja Dan, 898 F.

Supp. at 900 (citing Spence, Payne, Masington & Grossman, P.A. v. Philip M. Gerson, P.A., 483

So. 2d 775, 777 (Fla. App. 1986)); see also Roessler, 858 So. 2d at 1162; Izquierdo v. Hialeah

---

[17]These agency principles provide yet another basis for concluding that Shaheen's argument concerning his gratuitous intentions have no bearing on the nature of the purported settlement agreement.  See discussion supra, note 15.  That is, if it is the case that Ayoub acted with apparent authority in executing the settlement agreement with Samra, then Shaheen is bound by whatever terms were negotiated and placed in that agreement by virtue of the doctrine of apparent authority.  It follows that Shaheen's intentions for the terms of the agreement are wholly irrelevant.  After all, Samra might have reasonably believed that Ayoub had the authority to settle with her on Shaheen's behalf even though, without her knowledge, Shaheen forbade Ayoub from negotiating with Samra at all. Nevertheless, if Samra could demonstrate that Ayoub acted with apparent authority, Shaheen would be bound to the terms of a settlement agreement that Ayoub formed with Samra on Shaheen's behalf, despite Shaheen's having expressly repudiated any and all possible settlement terms by rejecting the idea of negotiating in the first place.  The doctrine of apparent authority functions to bind the principal solely based on the principal's manifestations to the third party, and absolutely independently of any representations made by the principal to the pseudo-agent.  This is why apparent authority may persist even when an agency relationship has been entirely terminated.

Hosp., Inc., 709 So. 2d 187, 188 (Fla. App. 1998); RESTATEMENT (SECOND) OF AGENCY § 27 (1958).

There are three incidents that are relevant to the question whether Shaheen made representations to Samra sufficient to create apparent authority in Ayoub.  First, the parties stipulate that Ayoub telephoned Samra in early February, 2004 to discuss settling her lawsuit against Shaheen.  See Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶ 4; Pl.'s Reply, Ex. A (Samra Decl.), at ¶ 10; Def.'s Opp., Ex. A (Shaheen Decl.), at ¶ 8.  Ayoub claims that Samra demanded $250,000 in exchange for dismissing the case, and that after reporting this demand to Shaheen, Shaheen authorized Ayoub to make a counteroffer of $50,000.  See Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶ 5.  Shaheen neither acknowledges nor disputes the claim that he authorized this counteroffer.  See generally Def.'s Opp., Ex. A (Shaheen Decl.).  Shaheen does concede, however, that he allowed Ayoub to contact Samra by telephone to discuss the possibility of a settlement.  Def.'s Opp., Ex. A (Shaheen Decl.), at ¶¶ 5–6.  Second, Shaheen concedes that Ayoub arranged for Samra to travel to London to meet with Shaheen.  See id. at ¶ 10.  Samra explains in her declaration that Ayoub told her he was arranging the meeting in London at Shaheen's request.  See Pl.'s Reply, Ex. A (Samra Decl.), at ¶ 12.  Ayoub contends that Shaheen instructed Ayoub to arrange the London meeting.  Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶ 6.

The third incident that is relevant for the apparent authority inquiry occurred at the February 15, 2004 meeting in London between Ayoub, Shaheen, and Samra.  According to Ayoub and Samra, at the meeting Shaheen expressly authorized Ayoub to act as Shaheen's agent in settlement negotiations going forward.  See Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶ 8, Pl.'s Reply, Ex. A (Samra Decl.), at ¶ 13.  Shaheen is silent on this matter, neither confirming nor

denying that he made such an explicit representation concerning Ayoub's authority at the London meeting.  <u>See</u> Def.'s Mot., Ex. A (Shaheen Decl.), at ¶¶ 11–16.  Shaheen does, however, admit to making certain other representations to Samra at that meeting.

According to his sworn declaration, submitted with his opposition to Samra's motion to enforce the purported settlement agreement, Shaheen asked Samra at the beginning of the London meeting whether "Mr. Ayoub had explained to [Samra] that I was opposed to a 'settlement meeting,' and that I was only there because of Mr. Ayoub's strong request."  Def.'s Opp., Ex. A (Shaheen Decl.), at ¶ 13.  Additionally, Shaheen avers that he "told everyone present [at the London meeting] that, if Ms. Samra dismissed the lawsuit unconditionally and immediately, I would confer with Mr. Ayoub and we would make a fair and reasonable contribution to address Ms. Samra's economic difficulties."  <u>Id.</u> at ¶ 16.  Shortly after the meeting at which these representations were made, Ayoub contacted Samra, explained that Shaheen had authorized Ayoub to offer her $150,000 to settle the case, and secured Samra's acceptance of that offer.  <u>See</u> Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶¶ 9–10; Pl.'s Reply, Ex. A (Samra Decl.), at ¶ 15.  Samra contends that "[a]t all times during my conversations with Ayoub, I understood that he was acting and speaking on Shaheen's behalf."  <u>See</u> Pl.'s Reply, Ex. A (Samra Decl.), at ¶ 11.

Again, for the purposes of determining the existence of apparent authority, only the representations of the principal to the third party are relevant.[18]  However, representations may be

---

[18]It is for this reason that the Court finds irrelevant Shaheen's insistence that he never intended Ayoub to act as his agent and that he instructed Ayoub that Ayoub was not authorized to enter into a settlement agreement with Samra on Shaheen's behalf.  <u>See</u> Def.'s Opp., Ex. A (Shaheen Decl.), at ¶¶ 7, 21.  To reiterate, <u>only</u> the principal's representations to the third party are relevant to the question of apparent authority.  Even if the actual agency relationship were fully revoked by the principal, that revocation would have no effect on the agent's apparent authority with respect to third parties until those third parties were made aware of the revocation of agency.  <u>See</u> RESTATEMENT (SECOND) OF AGENCY § 159, cmts. a–b.  Because Shaheen's intentions and instructions to Ayoub

made other than by the spoken word.  In fact, a principal may create apparent authority by

conduct—that is, by "'knowingly permit[ting] [an] agent to act in a certain manner as if he were

authorized." Ja Dan, 898 F. Supp. at 900 (quoting Rushing v. Garrett, 375 So. 2d 903, 906 (Fla.

App. 1979)) (modifications in original).  Indeed, a principal can create apparent authority by his

or her failure to act under certain circumstances—for example, by "'failing to correct a known

misrepresentation by an agent that he or she has certain authority.'"  Id. (quoting Owen Indus.,

Inc. v. Taylor, 354 So. 2d 1259, 1262 (Fla. App. 1978)).  Even a principal's silence may create

apparent authority if that silence connotes approval of an individual's actions that represent

agency authority.

The plaintiff contends that these representations are sufficient to support a finding of

apparent authority, and the Court agrees.  Shaheen offers no argument to rebut the plaintiff's

contention that Ayoub had apparent authority to bind Shaheen to a settlement agreement in his

opposition to the plaintiff's motion.  The burden of proof, however, remains on the plaintiff.  In

the interests of procedural fairness, the Court will take Shaheen's version of events to be correct,

and will make all inferences and resolve all ambiguities in favor of Shaheen.  Nevertheless, a

preponderance of the evidence supports a finding of apparent authority.

First, Shaheen knew Ayoub intended to telephone Samra to discuss settling the lawsuit

and that Ayoub contacted Samra to arrange for her attendance at the London meeting.  Thus,

Shaheen knowingly allowed Ayoub to take actions that could be reasonably viewed as the acts of

an agent authorized to facilitate a settlement with Samra.  Second, during the London meeting,

Shaheen did not take advantage of the opportunity to clarify, in Samra's presence, the nature of

---

were not communicated to Samra, she may have formed a reasonable belief that Ayoub was acting as Shaheen's
agent in the settlement negotiations.

Ayoub's involvement in the matter.  Rather, he further reinforced the perception that Ayoub was directly involved in negotiating the agreement by indicating that he would consult with Ayoub prior to determining an amount of money to offer Samra in exchange for dismissing her lawsuit. Finally, Shaheen knew that Samra was aware that Shaheen and Ayoub were business colleagues, which knowledge further supports the inference that Shaheen might have authorized Ayoub to act on Shaheen's behalf.  Each of these representations is consistent with the existence of an agency relationship between Shaheen and Ayoub in which Ayoub had authority to act on Shaheen's behalf during the process of settling Samra's lawsuit.

From the totality of the circumstances, the Court finds that Shaheen's representations to Samra, both verbal and otherwise, could lead a reasonable person in Samra's position to conclude that Ayoub had the authority to negotiate a settlement of this lawsuit on Shaheen's behalf.  Clearly, by accepting the offer of $150,000 in exchange for dismissal of her claims, Samra relied on her perception that Ayoub had the requisite authority to make such an offer, which perception was generated by Shaheen's representations.  Finally, Samra obviously materially changed position as a result of her reliance on Ayoub's apparent authority—she, too, is bound by the agreement.  If Samra were to refuse to dismiss her lawsuit after receiving the agreed-upon sum from Shaheen, Shaheen would have legal rights to enforce that agreement against her.  Thus, in reliance on Ayoub's authority to settle the matter, Samra effectively surrendered her right to pursue her underlying civil claims if Shaheen paid her the money.

Because Ayoub entered into the settlement agreement with Samra while clothed in apparent authority created by Shaheen's representations set forth above, Shaheen is bound to the settlement agreement by operation of agency principles.  Thus, the first element of the Florida-

law test for the existence of a valid, enforceable contract—the intent of the parties to be bound—is satisfied here as a matter of law.[19]  This finding means that Shaheen is bound under the settlement agreement by operation of agency law rather than contract law, such that Shaheen's arguments concerning his lack of intent to be bound to any settlement become irrelevant.

Having found that Shaheen is bound to the settlement agreement by operation of agency law, the Court turns to the second necessary showing in an action to enforce a settlement agreement under Florida law—that the parties to the purported settlement agreed upon all the essential elements of the contract.  See Spiegel, 834 So. 2d at 297; Bateski, 658 So. 2d at 631. Because agency principles dictate that Shaheen is bound by whatever terms Ayoub and Samra

---

[19]It should be noted that the legal standards applicable to the formation of a settlement agreement by an agent are slightly different where the agent is a party's attorney.  Under Florida law, "[a] party attempting to enforce a settlement [created by consent of the other party's attorney] bears the burden of showing that the attorney proposing the settlement had the clear and unequivocal authority from his client to do so."  Sosnick v. McManus, 815 So. 2d 759, 762–63 (Fla. App. 2002) (citing, inter alia, Sheldon Greene & Assocs., Inc. v. Holstein, 629 So. 2d 1009 (Fla. App. 1993); Cibula v. Ross, 597 So. 2d 915 (Fla. App. 1992); Weitzman v. Bergman, 555 S. 2d 448 (Fla. App. 1990)).  "Unauthorized assent manifested by a party's attorney is insufficient [to form an enforceable settlement] ... because an attorney employed merely to handle a litigated cause is not authorized to stipulate for the entry of a final decree on the merits."  Rushing v. Garrett, 375 So. 2d 903, 905 (Fla. App. 1979) (internal citations omitted).  Where an attorney acts as an agent of a party to a lawsuit during settlement negotiations, the actual and apparent authority of the attorney to act on the client's behalf are well established and limited by operation of law. Handling a litigation matter does not normally include the formation of agreements between adverse parties.  Of course, such contracts are often an integral part of the litigation process as a practical matter.  But for the purposes of apparent authority, which is limited to what authority a third party might reasonably perceive the purported agent to have, it is unlikely that a reasonable person would conclude that a trial attorney would have the authority to enter into a contract that resolves his or her client's substantive claims without some outward manifestation of consent by the client.

The Ayoub-Shaheen situation, however, is distinct from the attorney-client relationship.  Each manifestation that this Court considered in reaching the conclusion that Ayoub had the apparent authority to enter into a settlement agreement with Samra on Shaheen's behalf is consistent with the perception that Shaheen had granted Ayoub a specific measure of authority as Shaheen's agent—the authority to settle Samra's lawsuit.  Of course, then, Samra or any reasonable third party would be justified in believing that Ayoub was vested with the authority not only to negotiate the terms of a potential settlement, but to extend a valid offer of settlement on Shaheen's behalf once mutually satisfactory terms had been decided upon.  Thus the scope of Ayoub's apparent agency included the authority to enter into a binding settlement, which distinguishes the scope of apparent agency at issue here from that of a litigation attorney in most cases.

agreed upon, the Court need only look to their allegations regarding the essential terms of the settlement.

Ayoub and Samra agree that the offer was $150,000 in exchange for dismissal of Samra's lawsuit. See Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶ 9; Pl.'s Reply, Ex. A (Samra Decl.), at ¶ 15. There is some ambiguity, however, with respect to the parties' agreed-upon order of performance. While Samra contends that she "informed Ayoub [during a conversation prior to the London meeting] that I would not dismiss the lawsuit before Shaheen paid the settlement funds[,]" Pl.'s Reply, Ex. A (Samra Decl.), at ¶ 11, Ayoub insists that Samra accepted the offer of $150,000 conditioned on the requirement that Samra "drop[] the case unconditionally and immediately." Pl.'s Mot., Ex. A (Ayoub Decl.), at ¶ 9. Shaheen contends that he has not paid Samra anything because she has not yet dismissed the underlying lawsuit, while Samra argues that she never agreed to dismiss her civil claims prior to receiving the settlement money, and that it is Shaheen who has breached the settlement agreement by failing to pay the $150,000 before dismissal of the suit. Apparently, then, one possible interpretation of the requirement that Samra dismiss her civil suit "unconditionally and immediately" is that Samra was required to dismiss the lawsuit prior to Shaheen's payment of $150,000. This is, however, more than one possible interpretation of that phrase. Another would be that Samra would receive the $150,000 and then be required to dismiss her lawsuit "unconditionally and immediately," that is, immediately upon receipt of the settlement funds.

This is a classic case of ambiguity in a contractual term. "A word or phrase in a contract is 'ambiguous' only when it is of uncertain meaning, and may be fairly understood in more ways than one. The term 'ambiguous' means susceptible of more that one meaning." Friedman v.

Virginia Metal Prods. Corp., 56 So. 2d 515, 517 (Fla. 1952).  Ambiguity in contractual terms can support a finding that there was never a meeting of the minds concerning an essential term of the agreement, meaning that there is, in fact, no enforceable agreement at all.  See King v. Bray, 867 So. 2d 1224, 1226 (Fla. App. 2004); Cavallaro v. Stratford Homes, Inc., 784 So.2d 619, 621 (Fla. App. 2001); Allen v. Berry, 765 So. 2d 121, 122 (Fla. App. 2000).  Again, however, while Florida law requires proof that the parties agreed to all essential terms of a contract in order for that contract to be judicially enforceable, Spiegel, 834 So. 2d at 297, "uncertainty as to an agreement as to nonessential or small items will not preclude a finding of an enforceable [agreement]."  Id.  The relevant question for present purposes thus becomes whether the order of performance is an essential element of the Shaheen-Samra settlement agreement.

Whether a contractual term is "essential" to the agreement "will vary widely according to the nature and complexity of each transaction and will be evaluated on a case by case basis ...."  Socarras v. Claughton Hotels, Inc., 374 So. 2d 1057, 1060 (Fla. App. 1979).  Here, the Court finds that the singular goal of the parties to the settlement agreement was to exchange a sum of money for dismissal of Samra's lawsuit.  Thus, the expectation of the parties would be equally well effectuated whether payment preceded dismissal or vice-versa.  The order of performance, then, is incidental to the purpose of the parties in entering into the settlement agreement.  As such, any specification of the order of performance is a nonessential term of the settlement agreement, and ambiguity as to that term does not preclude this Court from finding that Ayoub and Samra formed a valid, binding agreement.  This conclusion accords with the general principle of contract law that courts in contract cases should strive to effectuate the central

purposes of parties to an agreement.  See 11 WILLISTON ON CONTRACTS § 32.9 (discussing the "main purpose doctrine").

According to general principles of contract interpretation, "the primary purpose of the court in interpretation of a contract is to ascertain the parties' intention so as to give effect to that intention." 11 WILLISTON ON CONTRACTS § 32:2.  Additionally, an ambiguous term in an offer should be "interpreted in the sense in which the [offeror] had reason to believe it was understood." St. Lucie County Bank & Trust Co. v. Aylin, 114 So. 438, 441 (Fla. 1927).  This principle, called the "standard of reasonable expectation ... assigns to words or other manifestations of intention the meaning which the party who used them should reasonably have expected that the other party would understand by them."  11 WILLISTON ON CONTRACTS § 31.11; see also RESTATEMENT (SECOND) OF CONTRACTS § 201(2)(b) ("Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made ... that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.").

Here, it is undisputed that Ayoub made the offer in the words he repeats in his declaration, and it is undisputed that Samra accepted that offer without objection.  Under general principles of contract law, then, Samra must be deemed to have accepted the requirement that she dismiss her lawsuit "unconditionally and immediately" in exchange for $150,000.  But again, from the context of the conversation and the prior dealings between Ayoub and Samra, that phrase could be interpreted in at least two different ways—that is, either to require dismissal immediately upon acceptance of the offer and before the payment of the money or to require

dismissal immediately upon receipt of the money.  The Court noted above that Samra told Ayoub before the London meeting that she would not dismiss her lawsuit before she received the settlement money.  Furthermore, because Shaheen is bound to the contract by the principle of apparent authority, he is bound by the meaning ascribed to the terms of the contract by the pseudo-agent Ayoub, and so Shaheen's intention that "unconditional and immediate dismissal" meant "dismissal prior to payment" is irrelevant to this inquiry.  And, there is no evidence in the record to indicate what, if any, meaning Ayoub ascribed to the phrase "unconditionally and immediately," just as there is no evidence to show that Samra insisted on a particular order of performance during the final negotiations with Ayoub.

Samra did, however, advise Ayoub prior to the telephone call during which the agreement was executed, that she was unwilling to dismiss her suit prior to the payment of settlement funds.  This could indicate that Ayoub had reason to know, at the time Samra accepted the offer of $150,000 in exchange for "unconditional and immediate dismissal" of her lawsuit, that Samra was agreeing to "unconditional and immediate dismissal" after receiving payment.  Were there some additional facts in the record to demonstrate that Ayoub had reason to know at the time the contract was actually formed that Samra continued to reject the notion of dismissing her suit prior to payment of the settlement money, the Court would be inclined to apply the standard of reasonable expectation and construe the phrase "unconditionally and immediately" in accordance with what Ayoub likely knew that Samra understood it to mean—"unconditional and immediate" dismissal after receipt of the money.  However, there are insufficient facts in the record to support such a finding.

As a default rule the Court applies the interpretive principle, set forth above, that ambiguous contractual terms should be interpreted, where possible, in the manner that best gives effect to the intentions of the parties.  Assuming arguendo that Ayoub included the phrase "unconditional and immediate" dismissal in the offer to echo Shaheen's desire that Samra dismiss her suit before Shaheen tenders the $150,000; and taking for granted that Samra desired just the opposite—payment before dismissal—the Court finds that simultaneous performance would correspond most closely to both the parties' intentions regarding the order of performance under the settlement agreement.  Clearly, Shaheen and Samra each wanted to secure the other's performance prior to tendering his or her own, most likely to protect themselves against potential breaches by the other party.  To say there may have been a lack of trust between the parties to this contract would be an understatement.  An order of simultaneous performance with the Court as intermediary seems to accomplish each party's goal of securing a measure of protection against treachery by the other.

This result is consistent with another general principle of contract law, which provides that, where possible, simultaneous performance of contractual obligations is preferred.  See RESTATEMENT (SECOND) OF CONTRACTS § 234(1); see also id., cmt. a ("A requirement that the parties perform simultaneously where their performances are to be exchanged under an exchange of promises is fair [because] ... it offers both parties maximum security against disappointment of their expectations of a subsequent exchange of performances by allowing each party to defer his own performance until he has been assured that the other will perform.").  Accordingly, the Court will order that Shaheen pay the $150,000 into the Court's registry, to be disbursed to Samra upon her voluntary dismissal of the underlying lawsuit.

## CONCLUSION

For the foregoing reasons, the Court concludes that Samra's motion for summary enforcement of the disputed settlement agreement shall be GRANTED.  The Court concludes that Shaheen is bound to the agreement entered into by Ayoub and Samra by the operation of the doctrine of apparent authority.  Additionally, the Court finds that the apparent dispute over the order of performance due under the contract is a dispute over a nonessential term that is easily resolved by the application of general interpretive canons.  Thus, the settlement agreement is valid and enforceable, and the Court will order that Shaheen pay $150,000 into the Court registry.  These funds will be distributed to Samra upon her voluntary dismissal of her underlying lawsuit.

A corresponding Order shall issue this date.


Signed by Royce C. Lamberth, United States District Judge, January 31, 2005.